**FILED**

JAN - 5 2005

LARRY W. PROPES, CLERK
CHARLESTON, SC

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| SOUTH CAROLINA FEDERAL CREDIT UNION, | ) ) ) | Case No.: 2:05-0031-18 |
| Plaintiff, | ) ) | COMPLAINT (DECLARATORY JUDGMENT) |
| v. | ) ) | JURY TRIAL DEMANDED |
| FIDELITY INFORMATION SERVICES, INC., FIDELITY NATIONAL FINANCIAL, INC., | ) ) ) ) | |
| Defendants. | ) ) | |

Plaintiff, South Carolina Federal Credit Union ("SCFCU"), complaining of Defendants,

Fidelity Information Services, Inc. ("FIS") and Fidelity National Financial, Inc. ("FNF") (both of

which will be sometimes referred to together in the Complaint as "Fidelity" or "Defendants"),

hereby alleges and says that:

## NATURE OF THIS ACTION

1.      This is an action for declaratory judgment pursuant to the Federal Declaratory

Judgment Act, 28 U.S.C. § 2201.

2.      Plaintiff, SCFCU, seeks to have this Court construe the meaning and enforce the

provisions of an agreement entered into by SCFCU and Fidelity whereby Fidelity agreed to

provide certain technology services to SCFCU.  SCFCU seeks a declaration of SCFCU's rights

and Fidelity's obligations to refund to SCFCU all fees paid to Fidelity and to reimburse SCFCU

for all expenses (up to $500,000) associated with staff time during the project and equipment

upgrades to SCFCU's existing hardware system.

CLT 832215v4

## THE PARTIES

3.      SCFCU is a federally created credit union duly organized under the laws of the United States of America, with its principal place of business in North Charleston, South Carolina.

4.      Upon information and belief, FNF is a Delaware corporation with its principal place of business in Jacksonville, Florida. FIS is an Arkansas corporation with its principal place of business in Plano, Texas. Fidelity provides application software, information processing management, and information technology products and services to the financial services and mortgage industries, and in particular, to credit unions.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between SCFCU and Fidelity and the amount in controversy exceeds $75,000.00.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to this claim occurred in North Charleston, South Carolina, which is within this district.

7.      There is an actual, justifiable controversy between SCFCU and Fidelity.

## THE AGREEMENT

8.      On November 10, 2003, SCFCU entered into a Licensed Technology Agreement (the "Agreement") with Aurum Technology Inc. ("Aurum"). Upon information and belief, on March 11, 2004, Aurum was acquired by FNF. Upon information and belief, FIS is the division, subsidiary, and/or affiliate of FNF through which FNF exclusively provides all of its technology solutions in the financial services market. Upon information and belief, FNF controls and dominates FIS, such that FIS is the alter ego of FNF. (Thus, Plaintiff refers to both as "Fidelity"

2

CLT 832215v4

in the remaining allegations of this Complaint.)  Since FNF acquired Aurum, Fidelity has

performed under the Agreement as Aurum's successor in interest.  Fidelity is bound by the terms

of the Agreement.

9.      A true and accurate copy of the Agreement (including the incorporated schedules

and first Addendum) is attached hereto as Exhibit A.

10.      Pursuant to the Agreement, Fidelity agreed to license certain information

technology products to SCFCU and install them for use by SCFCU in its facilities.

11.      SCFCU agreed to pay to Fidelity specified licensing, service, and maintenance

fees for the products.  Even though it was experiencing significant issues with the products and

Fidelity's installation of its products, based on its reliance on Fidelity's ongoing assurances and

representations, over the course of the agreement, SCFCU has paid Fidelity (including its

predecessor in interest, Aurum) $2,744,805.80.

12.      During the course of SCFCU's relationship with Fidelity, SCFCU regularly

reported to Fidelity and its personnel the multiple issues and problems that were arising from

Fidelity's products and its performance under the Agreement.  Among other things, Fidelity

failed to complete tasks by required contractual dates, and much of the work it did complete did

not meet the required contractual standards.

13.      Because of these issues and ongoing difficulties, among other things, SCFCU

requested that Fidelity amend the Agreement to confirm Fidelity's commitment to the

Agreement, to establish absolute deadlines for critical work, and to provide SCFCU with an

opportunity to recover certain damages in the event of nonperformance.

14.      As the result of the continuing difficulties and discussions about them, Fidelity's

president and senior vice president asked to meet with SCFCU's Board of Directors to discuss

matters.  On November 22, 2004, at SCFCU's principal office in North Charleston, South

3

Carolina, Gary Norcross and Santo Cannone, Fidelity's president and senior vice president, respectively, met with SCFCU's management and Board of Directors.  During the course of this meeting, among other things, through its president and senior vice president, Fidelity represented to SCFCU that:

    a) Fidelity had the resources (personnel, products and know how) and commitment to complete performance of its contractual obligations;

    b) Fidelity would "take care of" and "do right by" SCFCU;

    c) Fidelity recognized that the outstanding issues were "a matter of trust" that it was committed to a "long term relationship" with SCFCU, and that there was "absolutely, absolutely no question" that they were looking to be SCFCU's "long term business partner"; and

    d) Fidelity "absolutely" had "the plan" to meet its contractual obligations at the end of November and December.

15.    On December 2, 2004, SCFCU and Fidelity executed Addendum No. 2 to Fidelity Information Services, Inc. Licensed Technology Agreement (the "Addendum," attached hereto as Exh. B) wherein Fidelity agreed to provide Satisfactory Delivery to SCFCU of certain products and services identified in attachments to the Addendum.

16.    The Addendum defined Satisfactory Delivery as "(i) free from defects which substantially affect [SCFCU's] ability to service its members; (ii) operating without errors; (iii) operating in accordance with signed Functional Requirement Documents (FRDs); (iv) operating in accordance with Professional Quote Requirements (PQRs); and (v) meets objectives of User Acceptance Testing (UAT) as agreed upon by [SCFCU] and Fidelity."

17.    Moreover, in the Addendum, the parties agreed that if Fidelity failed to satisfactorily deliver all products and services due on or before December 31, 2004, then SCFCU has the right to (i) immediately terminate the Agreement with no further obligation to Fidelity, (ii) terminate any and all other executory contracts with Fidelity and all of SCFCU's obligations

4

thereunder (including the July 1, 2004, Aurum Technology Inc. Information Services Technology Services Agreement (the "Technology Service Agreement")), and (iii) receive a full refund of all fees paid to Fidelity. In addition, Fidelity agreed to reimburse SCFCU up to $500,000 for expenses associated with staff time during the project and equipment upgrades in the event the Agreement was terminated pursuant to the Addendum.

18.    Pursuant to the Agreement, the prevailing party in any court action brought pursuant to the Agreement is entitled to recover reasonable attorneys' fees and other costs incurred in connection with such action, including expenses and costs of investigation, witness fees, and travel, in addition to any other relief to which the prevailing party may be entitled.

19.    In the Addendum, the parties expressly agreed that the Agreement, as amended by the Addendum, remained in full force and effect.

## THE BREACH

20.    After execution of the Addendum, Fidelity failed to provide the resources necessary for performance of its contractual obligations under the Agreement and Addendum, as its president and senior vice president had represented at the November 22, 2004 SCFCU board meeting. Notwithstanding weekly status meetings at which many of Fidelity's service and products were highlighted for not being satisfactory, Fidelity continued to represent that it was meeting the Agreement's performance criteria. At the same time, however, Fidelity's personnel working on the project were reduced. By the last week of December 2004, Fidelity was doing only minimal work under the Agreement, and was not attempting to provide the resources necessary to complete its work in accordance with the Agreement.

21.    As the consequence of Fidelity's actions and inactions, as of December 31, 2004, Fidelity had failed to provide Satisfactory Delivery, as defined in the Addendum, of a number of the products and services due under the Agreement (including the Addendum and exhibits

5

attached thereto). In particular, the products and services (i) contained defects which substantially affect SCFCU's ability to service its members, (ii) did not operate without error, (iii) failed to operate in accordance with the signed Functional Requirements Documents, (iv) failed to operate in accordance with Professional Quote Requirements, and (iv) did not meet the agreed upon objectives of User Acceptance Testing.

22.     By letter dated January 5, 2005, after its evaluation of the status of Fidelity's performance under the Agreement and Addendum, SCFCU notified Fidelity that Fidelity had breached its obligations under the Agreement and that SCFCU was terminating the Agreement effective immediately.  In accordance with the terms of the Addendum, SCFCU also notified Fidelity of the termination of the Technology Services Agreement, and demanded a refund of all amounts paid to Fidelity pursuant to the Agreement and reimbursement of all expenses associated with staff time associated with the project and necessary hardware upgrades.

23.     As the result of Fidelity's breaches, SCFCU has terminated the Agreement and all additional agreements between the parties, and is entitled to a refund of all amounts paid to Fidelity pursuant to the Agreement, to reimbursement of all expenses associated with staff time on the project and necessary equipment upgrades, and to recovery of its attorneys fees, expenses, and costs associated with Fidelity's breach.

24.     Upon information and belief, without regard to the needs and requirements of SCFCU, conduct of its business, or the best interests of its members, Fidelity did not intend to meet the contractual deadlines imposed upon it.  Instead, upon information and belief, Fidelity intended to use its continuing representations to position SCFCU so that it could not terminate the Agreement and would have no choice but to continue to use Fidelity to complete the Agreement.  By its actions, Fidelity intended to put SCFCU in such a position that Fidelity

6

would not have to refund the monies paid to it by SCFCU and it could avoid other consequences from its failure to perform the Agreement.

25.    Fidelity has failed to honor, or has by its actions shown its intention not to honor, its obligations to SCFCU under the Agreement and Addendum.

## CLAIM FOR RELIEF
### (DECLARATORY JUDGMENT)

26.    SCFCU repeats and realleges paragraphs 1 through 25, as if fully set forth herein.

27.    Under the Agreement, upon its failure to provide Satisfactory Delivery of certain products and services identified in the Addendum by December 31, 2004, Fidelity is deemed to have breached the Agreement and is liable to SCFCU for the amounts paid by SCFCU to Fidelity under the Agreement and for the amounts (up to $500,000) spent by SCFCU for staff time and equipment upgrades.

28.    By its January 5, 2005 letter of termination to Fidelity, SCFCU has demanded that Fidelity honor its duties under the Agreement and Addendum to pay such amounts to SCFCU.

29.    As shown by its conduct, and in particular, by its ongoing misrepresentations and those made at the November 22, 2004 board meeting, Fidelity will dispute its obligations under the Agreement and Addendum to pay such funds to SCFCU and will seek to avoid payment of such monies to SCFCU.

30.    As a result of the foregoing, the rights, status, and other relations between SCFCU and Fidelity are uncertain and an actual and justifiable controversy exists between SCFCU and Fidelity regarding Fidelity's obligations under the Agreement and Addendum to refund all amounts paid to Fidelity under the Agreement and to reimburse SCFCU for all amounts (up to $500,000) spent on staff time for the project and necessary equipment upgrades.

CLT 832215v4

31.     Pursuant to 28 U.S.C. § 2201, SCFCU seeks a declaration by this Court that the Agreement as amended is terminated, that Fidelity is obligated to refund all amounts paid to Fidelity under the Agreement and that Fidelity is obligated to reimburse SCFCU for all amounts (up to $500,000) spent on staff time for the project and necessary equipment upgrades.

32.     Declaratory relief from this Court will determine all or some of the dispute between SCFCU and Fidelity.

33.     A judicial declaration is necessary to establish SCFCU's rights and Fidelity's obligations under the Agreement and its Addendum.

WHEREFORE, Plaintiff SCFCU respectfully requests that this Court determine and declare that:

1.      Fidelity has breached the Agreement (including all Addenda thereto);

2.      SCFCU is entitled to terminate the Agreement;

3.      Fidelity must refund to SCFCU all amounts paid to Fidelity under the Agreement and reimburse SCFCU for all amounts (up to $500,000) spent on staff time on the project and necessary equipment upgrades;

4.      SCFCU is entitled to its attorneys' fees, expenses, and costs for bringing this action, including prejudgment and post-judgment interest, together with such other and further relief as the Court shall deem just and proper.

5.      All issues of fact will be determined by a jury.

_(signature)_ (#6007)

Robert C. Byrd, Federal ID 1643
Attorney for Plaintiff
PARKER POE ADAMS & BERNSTEIN, L.L.P.
200 Meeting Street, Suite 301
Charleston, SC 29401
Telephone: 843-727-2650
Facsimile: 843-727-2680
bobbybyrd@parkerpoe.com

Charleston, South Carolina

January **5**, 2005

**OF COUNSEL:**

**PARKER POE ADAMS & BERNSTEIN, L.L.P.**
William L. Rikard, Jr.
Three Wachovia Center
401 South Tryon Street, Suite 3000
Charlotte, NC 28202
Telephone: 704-372-9000
Facsimile: 704-334-4706
williamrikard@parkerpoe.com

9

# EXHIBIT A

RECEIVED NOV 1 2 2003

**AURUM TECHNOLOGY INC.**
**LICENSED TECHNOLOGY AGREEMENT**

THIS LICENSED TECHNOLOGY AGREEMENT by and between Aurum Technology Inc., a Delaware corporation with its principal place of business located in Plano, Texas ("Aurum"), and Licensee, as identified below, (each of Aurum and Licensee, a "party" and, collectively, the "parties") is made as of the later of the dates on which the parties sign below.

Aurum provides information technology products and services to the financial services industry, including eBusiness services, image-based item processing and core systems and services.

Licensee wants to license from Aurum, and Aurum wants to license to Licensee, such information technology products now, and as Licensee and Aurum may decide in the future.

The parties agree to the terms and conditions set forth on this page and in the following attachments that are incorporated into the agreements of the parties and made a part of them by this reference: Each schedule, and the terms and conditions on this page and in the General Terms & Conditions, constitutes a separate and independent legal agreement.

☒ General Terms & Conditions (v. 2003.1)
**Core Processing System Schedules**
☒ Software (v. 2003.1 SC09 9.1.2003)
☒ Professional Services (v. 2003.1 SC09 9.1.2003)
☒ Maintenance (v. 2003.1 SC09 9.1.2003)
☒ Hardware Purchase (v. 2003.1 SC09 9.1.2003)
**Branch Automation (BA) System Schedules**
☒ ViewPoint BA Software (v. 2003.1 SC09 9.1.2003)
☒ ViewPoint BA Professional Services (v. 2003.1 SC09 9.1.2003)
☒ ViewPoint BA Maintenance (v. 2003.1 SC09 9.1.2003)

**Telephone Banking System Schedules**
☒ Software (v. 2003. 1 SC09 10.24.03)
☒ Professional Services (v. 2003.1 SC09 10.24.03)
☒ Maintenance (v. 2003. 1 SC09 10.24.03)
☒ Hardware Purchase (v. 2003. 1 SC09 10.24.03)
**Other Schedules**
☒ Addendum to Licensed Technology Agreement General Terms and Conditions (v. 2003.1 SC09 10.9.03)

THE AUTHORIZED OFFICER OR REPRESENTATIVE OF EACH PARTY has signed this Software License Agreement as a legally binding obligation of such party.

**AURUM TECHNOLOGY INC.**

By: _____

_____
Sam J. Cannone
(Name)

_____
Senior Vice President
(Title)

November 10, 2003
(Date)

2701 West Plano Parkway
(Street Address)

**Suite 600**
(Suite No. or Other)

**Plano, Texas 75075-8210**
(City, State & Zip Code)

972.943.2612
(Facsimile Number)

General.Counsel@AurumTechnology.com
(Email)

**General Counsel**
(Person to Whom Notices Should be Addressed)

**South Carolina Federal Credit Union ("LICENSEE")**

By: _Bonnie K Kendrick_

_Bonnie K. Kendrick_
(Name)

_Chief Information Officer_
(Title)

_November 6, 2003_
(Date)

2175 Credit Union Lane
(Street Address)

_____
(Suite No. or Other)

North Charleston, SC 29406
(City, State & Zip Code)

800.845.0432
(Facsimile Number)

bkendrick@scfed.com
(Email)

**Bonnie Kendrick**
(Person to Whom Notices Should be Addressed)

(v. 2003.1)

**AURUM TECHNOLOGY INC.**
**LICENSED TECHNOLOGY AGREEMENT**
**GENERAL TERMS & CONDITIONS**

**LICENSED PROGRAM USE**

1.      When a software schedule is made, Aurum grants to Licensee, subject to these terms and conditions and any others set forth in such software schedule, a term, nonexclusive, nontransferable, personal and internal use license to use the Licensed Program(s) identified on that software schedule only at the Designated Seat(s) or Site(s) or in the Designated CPU(s) of Licensee identified on the software schedule and only for the internal operations of Licensee and for the processing of its own data. The Licensed Program(s) include all program code (as further identified on the applicable software schedule), documentation and training materials embodying or related to such program code and any subsequent versions or releases of the Licensed Program(s) that may be delivered to Licensee and all copies of any of the foregoing.

**MAINTENANCE; PROFESSIONAL SERVICES & HARDWARE PURCHASE**

2.      Also, subject to these terms and conditions and any others set forth in the applicable schedule (including the payment of any charges set forth in such schedule), Licensee will receive professional services and maintenance as described in the applicable professional services schedule or maintenance schedule or will purchase hardware manufactured by a third party and sold and delivered by Aurum as described in the applicable hardware purchase schedule.

**TITLE, CONFIDENTIALITY & RESTRICTIONS**

3.      All right, title and interest in and to the Licensed Program(s) remains with Aurum, and the Licensed Program(s) are Aurum's trade secret and proprietary property. Licensee will keep the Licensed Program(s) confidential, and Licensee will not disclose or otherwise distribute the Licensed Program(s) to anyone other than Licensee's authorized employees. Licensee will not remove or destroy any of Aurum's proprietary markings. Licensee will not permit anyone except its authorized employees to have access to the Licensed Program(s). Except for archiving as these terms and conditions permit, Licensee will not make or permit others to make copies of or reproduce any part of the Licensed Program(s) in any form without Aurum's prior written consent. In no event will Licensee

decompile, disassemble or otherwise reverse engineer or modify the Licensed Program(s).

4.      If Licensee makes any changes to the code of the Licensed Program(s) (as opposed to mere changes in user configuration that the Licensed Program(s) may allow), Licensee agrees that such changes and modifications will be Aurum's property, unless Aurum has given its prior written consent to the contrary; and Licensee will assign, and does hereby assign, to Aurum all right, title and interest in and to such changes and modifications.

5.      If Licensee moves its computer installation, the Licensed Program(s) can be transferred to new Designated Site(s) without a relocation charge to Licensee, but Licensee must give prior written notice to Aurum of such move and confirm to Aurum that the old computer installation has been closed. If Licensee wants to operate the Licensed Program(s) at a seat or site or on a CPU other than the Designated Seat(s), Site(s) or CPU(s), Licensee will be required to obtain Aurum's prior written consent and pay Aurum's then-applicable upgrade, supplemental, transfer or replacement fees. Licensee may not transfer the Licensed Program(s) outside of the United States. Aurum has the right to audit Licensee's compliance with these terms and conditions and other provisions of an agreement upon 3 days' written notice and during Licensee's normal business hours.

6.      If the license agreement for the Licensed Program(s) terminates for any reason, Licensee will either return or destroy, and will delete from any computer libraries or storage devices, all copies or partial copies of the Licensed Program(s). Licensee will thereafter certify in writing to Aurum that all copies or partial copies of the Licensed Program(s) have been either returned to Aurum or otherwise destroyed and deleted from any computer libraries or storage devices and are no longer used by Licensee.

**DATA OWNERSHIP & PRIVACY**

7.      All information of Licensee (including that of its customers) provided to Aurum by Licensee and contained in Aurum's data files, is the exclusive property of Licensee, and Aurum is only the custodian of that information. Except as may

(v. 2003.1)

be otherwise provided in a schedule, both Aurum and Licensee (and, as to both parties, their employees, agents and independent contractors) will receive and hold all information communicated to one by the other or the other's affiliates, whether before or after the date of an agreement, in strict confidence, will use such information only for purposes of an agreement and will not disclose such information without the prior written consent of the other party. Each party will take all commercially reasonable precautions to prevent the disclosure to outside parties of such information, including the terms of an agreement. If a legal, accounting or regulatory requirement (including a requirement of a Federal or state regulatory authority with jurisdiction over Customer or Customer's business) requires a party to disclose any information of the other party, then such party will, unless otherwise prohibited by law, promptly notify the other party of such requirement and will cooperate with such other party (at their expense) in their efforts, if any, to avoid or limit such disclosure (including obtaining an injunction or an appropriate redaction of the information in question). The provisions of this section will survive the expiration or termination of an agreement.

8. Aurum will use commercially reasonable efforts to (a) ensure the security and confidentiality of Licensee information (including that of its customers); (b) protect against any anticipated threats or hazards to the security or integrity of such information and (c) protect against unauthorized access to or use of such information that could result in substantial harm or inconvenience to Licensee. Aurum will employ and maintain controlled access to systems in its data centers and other facilities where such customer information is located.

**LIMITED WARRANTY**

9. Aurum represents and warrants that the Licensed Program(s) will operate according to the specifications for the Licensed Program(s) published as of the date of a license agreement by Aurum for a period of 90 days from the date of delivery of the Licensed Program(s). If the Licensed Program(s) do not operate according to such specifications, Aurum's only responsibility will be to use commercially reasonable efforts, consistent with industry standards, to cure the defect. Aurum also represents and warrants that it can grant the license described in these terms and conditions, that the license will not infringe on any United

States letters patent, any trade secret or any copyright, trademark, service mark, trade name or similar proprietary right conferred by common law or by any law of the United States or any state thereof and that it has no knowledge of any existing adverse claim against its right to grant such license.

10. Aurum will indemnify, defend and hold harmless Licensee from any and all claims, actions, damages, liabilities, costs and expenses, including reasonable attorneys' fees and other costs, arising out of a breach of any of Aurum's representations and warranties that a license will not infringe on the intellectual property of another. This indemnity will not apply if such claim or action for infringement results from the modification of the Licensed Program(s) by anyone other than Aurum or the combination of the Licensed Program(s) with any other product or program. Further, this indemnity will not apply unless Licensee informs Aurum as soon as practicable, but in no event more than 30 days after receipt, of any claim or action alleging such infringement and has given Aurum full opportunity to control the response thereto and the defense thereof, including any agreement relating to settlement.

11. If an infringement claim has occurred or in Aurum's opinion is likely to occur, or if a Licensed Program is held to constitute an infringement and its use is or may be enjoined, Aurum may at its option and expense either replace or modify the Licensed Program so that it becomes non-infringing or procure for Licensee the right to continue using the Licensed Program. If using commercially reasonable means Aurum cannot provide either of these alternatives, Licensee agrees on written notice from Aurum to return or destroy, and certify in writing the destruction of, the original and all copies of the Licensed Program, and Aurum will refund all prepaid fees to Licensee, prorated on a straightline 5-year basis.

12. The remedies provided for in the two preceding sections are Licensee's sole and exclusive remedies for a breach or an anticipated breach of Aurum's representations and warranties that a license granted under an agreement will not infringe on the intellectual property of another.

13. Aurum represents and warrants that it will use due care in providing the professional

services and maintenance as described in the applicable professional services schedule or maintenance schedule.

## WARRANTY & LIABILITY LIMITATIONS

14.    Any changes or modifications that Licensee makes to a Licensed Program voids the foregoing limited warranties. EXCEPT AS SET FORTH ABOVE, AURUM MAKES NO OTHER WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, ACCURACY OF INFORMATIONAL CONTENT, SYSTEM INTEGRATION AND NON-INFRINGEMENT; AND AURUM MAKES NO WARRANTIES WITH RESPECT TO ANY HARDWARE THAT AURUM MAY SUPPLY TOGETHER WITH THE LICENSED PROGRAM(S) OR FOR THEIR IMPLEMENTATION. With respect to hardware supplied by Aurum, Aurum will, upon request, assign to Licensee any warranties that have been made by the original manufacturer of such hardware that may be so assigned.

15.    Regardless of anything else in an agreement and to the greatest extent permitted by law, no court, tribunal, arbitrator or presiding officer of any administrative or other proceeding may award to Licensee any special, indirect, consequential, speculative or incidental damages (including lost profits or goodwill) or punitive damages in any dispute (including any dispute based on alleged fraudulent, willful or dishonest conduct) against Aurum, and Licensee expressly, completely and irrevocably waives any right to obtain such damages in connection with any such proceeding. Licensee acknowledges that, prior to agreeing to the foregoing provision, it has consulted, or waived the right to consult, legal counsel as to the consequences of this provision. The foregoing limitations do not apply to infringement claims made under an agreement

16.    Any warranties made by Aurum (other than that of non-infringement) will extend and be in effect only for the period for which Licensee has paid all applicable fees and charges.

## DISASTER RECOVERY

17.    In the event that Licensee certifies in writing to Aurum that it has a bona fide disaster recovery plan with respect to its computer operations, Licensee may make one copy of the

Licensed Program(s) for archival purposes and use such archival copy at a seat or site or on a CPU other than the Designated Seat(s), Site(s) or CPU(s), provided that such other seat, site or CPU is owned or controlled by Licensee. The use of such archival copy is limited (a) to conducting testing of the disaster recovery plan's procedures and effectiveness (which testing will not exceed 1 week in any 3-month period) and (b) during any period subsequent to the occurrence of an actual disaster during which Licensee cannot operate the Licensed Program(s) at the Designated Seat(s) or Sites(s) or on the Designated CPU, to using the Licensed Program(s) at a seat or site or on a CPU other than the Designated Seat(s), Site(s) or CPU(s), provided that such other seat, site or CPU is owned or controlled by Licensee. Licensee agrees to furnish such further documentation with respect to its disaster recovery plan and procedures as Aurum may reasonably request from time to time.

## BREACH & TERMINATION

18.    If Licensee breaches any of these terms and conditions or other provisions of an agreement or fails to pay when due any valid invoice Aurum renders, or if Licensee becomes insolvent or if bankruptcy or receivership proceedings are initiated by or against Licensee, Aurum may (but is not obligated to) terminate any one or all of agreements that it has with Licensee immediately and, in addition to all other rights of Aurum, all amounts that would have become due and payable under an agreement will immediately become due and payable to Aurum.

## ASSIGNMENT

19.    Licensee may not sell, assign or otherwise transfer its rights or delegate any of its duties under an agreement without Aurum's advance written consent. A sale, assignment or other transfer of an interest in Licensee to any entity or person which has the effect of transferring all or substantially all of the assets of Licensee, including Licensee's interest in the license, will not be considered an assignment that will require prior written consent of Aurum.A sale, assignment or other transfer of an interest in Licensee to any entity or person that has the effect of transferring less than all or substantially all of the assets of Licensee and that includes as part of the transferred assets Licensee's interest in the License, will be considered an assignment that will require prior written consent of Aurum.

Aurum, however, may assign an agreement to any third party, provided that such party assumes Aurum's obligations. Aurum may also assign its right to payment under an agreement or grant a security interest in an agreement or such payment right to any third party without requiring that such third party be liable for Aurum's obligations under that agreement.

**TAXES & LATE FEES**
20.      Licensee is responsible for paying any sales, use, excise, value-added, personal property or other tax or duty, regardless of what it is called, that any taxing authority levies on the products and services provided under an agreement; but Licensee is not responsible for any tax based upon Aurum's net income.

21.      Aurum will charge Licensee (and Licensee will thereafter pay), on the first day of each month for which any payment required in an agreement remains unpaid when due, a late fee equal to the lesser of 2% of the outstanding and delinquent account balance or the maximum lawful late fee.

**SOURCE CODE ESCROW**
22.      Aurum has deposited a copy of the program source code for the Licensed Program(s) with an escrow agent and will, in accordance with Aurum's agreement with that escrow agent, update such program code. Licensee may, by paying the current charge and executing the applicable documents, become a beneficiary of such escrow agreement and, in accordance therewith, be entitled to obtain a copy of such program code from the escrow agent.

**MISCELLANEOUS**
23.      Each schedule, and these terms and conditions that are by reference a part of it, constitutes a separate and independent legal agreement and is effective and binding upon both partiesas of the date made. The parties may agree to one or more additional schedule(s); and, if so, the agreement(s) established will be evidenced by signing a Licensed Technology Agreement that will incorporate these terms and conditions and those set forth in such schedule(s).

24.      Each agreement is the entire agreement of the parties and supersedes all other prior agreements and understandings, whether written or verbal, with respect to the subject

matter of that agreement. An agreement may not be amended except in a writing signed on behalf of both parties, and no waiver of any provision of or right under an agreement will be effective against a party unless that waiver is in a writing signed on behalf of the party against whom the waiver is asserted.

25.      Each agreement is binding on the parties and their respective successors and permitted assigns.

26.      If either party has a claim against the other based on an agreement, including its formation or a breach of it, such party must bring that claim, by filing with the other party a request for mediation, within 2 years of the occurrence that is the basis for the claim.

27.      If a dispute arises out of or relates to an agreement, including its formation or a breach of it, and if the dispute cannot be settled through negotiation, the parties agree first to try in good faith to settle the dispute by mediation conducted under the Commercial Mediation Rules of the American Arbitration Association (except for those changes specifically set forth in these terms and conditions), or such other rules and procedures to which the parties and the mediator may agree, before resorting to litigation or some other dispute resolution procedure. Mediation will commence when a party sends a written request for mediation of a dispute to the other party, and the parties will select a single mediator to serve. The parties will each pay their own expenses in connection with the mediation (including attorneys' fees and other costs), and they will share equally in paying the mediator (including any fees and other costs).

28.      All notices, claims, demands and other communications between the parties must be in writing and will be deemed given (a) in the case of a facsimile transmission or email, when the sender has received an electronic confirmation of transmission by the transmitting equipment (provided that such transmission is completed prior to 5:00 p.m., local time at the location of the recipient, on a business day; otherwise, such transmission will be deemed to have been received on the next business day); (b) in the case of delivery by a standard overnight carrier, upon the date of delivery indicated in the records of such carrier; or (c) in the case of delivery by hand, when delivered by hand addressed to the person at the address set forth on the signature

AURUM TECHNOLOGY INC.
LICENSED TECHNOLOGY AGREEMENT
GENERAL TERMS & CONDITIONS
Page 4
(v. 2003.1)

page of an agreement (or to another address provided by notice under this section).

29.   Each agreement is entered into and executed in Texas. The laws of the State of Texas, excluding its choice of law principles, will govern the relationship between the parties and disputes, differences, controversies or claims directly or indirectly based on an agreement, including those relating to the formation, validity, interpretation, construction, performance, breach, enforceability or termination of an agreement and duties based on tort, contract or statutory concepts.

30.   THE   PARTIES   HEREBY IRREVOCABLY AGREE THAT JURISDICTION AND VENUE IN ANY ACTION BROUGHT BY ANY PARTY PURSUANT TO AN AGREEMENT WILL EXCLUSIVELY LIE IN ANY FEDERAL OR STATE COURT LOCATED IN DALLAS COUNTY, TEXAS. BY EXECUTION AND DELIVERY OF AN AGREEMENT, EACH PARTY, ON BEHALF OF ITSELF AND ITS PERMITTED SUCCESSORS AND ASSIGNS, IRREVOCABLY   SUBMITS   TO   THE JURISDICTION OF ANY SUCH COURT OVER ITSELF AND ITS PROPERTY WITH RESPECT TO ANY SUCH ACTION. THE PARTIES IRREVOCABLY AGREE THAT VENUE WOULD BE PROPER IN SUCH COURT, AND HEREBY WAIVE ANY OBJECTION THAT SUCH COURT IS AN IMPROPER OR INCONVENIENT FORUM FOR THE RESOLUTION OF SUCH ACTION. THE PARTIES FURTHER AGREE THAT THE MAILING BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, OF ANY PROCESS REQUIRED BY ANY SUCH COURT WILL CONSTITUTE VALID AND LAWFUL SERVICE OF PROCESS AGAINST THEM, WITHOUT NECESSITY FOR SERVICE BY ANY OTHER MEANS PROVIDED BY STATUTE OR RULE OF COURT.

31.   EACH PARTY WAIVES, TO THE FULLEST   EXTENT   PERMITTED   BY APPLICABLE LAW, THE RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING BASED ON AN AGREEMENT.

32.   Except as expressly provided for with respect to mediation, the prevailing party in any action brought by a party pursuant to an agreement is entitled to recover reasonable attorneys' fees and other costs incurred in connection with such action, including expenses

and costs of investigation, witness fees and travel, in addition to any other relief to which the prevailing party may be entitled.

33.   The parties understand that an agreement is a legally binding agreement that may affect their rights. Each party represents to the other that they have received legal advice from counsel of their choice regarding the meaning and legal significance of an agreement and that they are satisfied with their legal counsel and the advice received from their legal counsel or that they have waived their right to do so.

34.   If any provision of an agreement requires judicial or administrative interpretation or interpretation by an arbitrator, mediator or similar person, such person interpreting that agreement will not apply a presumption that its terms will be more strictly construed against the person who itself or through its agent prepared that document.

35.   The invalidity or unenforceability of any provision of an agreement will not affect the validity or enforceability of the other provisions of that agreement and such other provisions will remain in full force and effect. If any provision of an agreement is deemed to be unenforceable by reason of its extent, duration, scope or otherwise, then the parties contemplate that the person making that determination will reduce such extent, duration, scope or other provision and will enforce it in its reduced form for all purposes contemplated by that agreement. Nothing in an agreement, express or implied, is intended to confer upon any person not a party to that agreement any rights or remedies of any nature whatsoever under or by reason of that agreement.

36.   In the event of a conflict between these terms and conditions and any provision in a schedule, these terms and conditions will govern the interpretation of an agreement.

37.   Termination of an agreement will not affect the rights or obligations of the parties that arose prior to, or that are expressly intended by their terms to continue beyond, any such termination, and such rights or obligations, and the dispute resolution procedures set forth in these terms and conditions, will survive any such termination.

ADDENDUM TO
AURUM TECHNOLOGY INC.
LICENSED TECHNOLOGY AGREEMENT
GENERAL TERMS & CONDITIONS

Paragraph 5 is deleted and replaced in its entirety with the following:

"If Licensee moves its computer installation, the Licensed Program(s) can be transferred to new Designated Site(s) without a relocation charge to Licensee, but Licensee must give prior written notice to Aurum of such move and confirm to Aurum that the old computer installation has been closed. If Licensee wants to operate the Licensed Program(s) at a seat or site or on a CPU other than the Designated Seat(s), Designated Site(s) or Designated CPU(s), Licensee will be required to obtain Aurum's prior written consent and pay Aurum's then-applicable upgrade, supplemental, transfer or replacement fees. Licensee may not transfer the Licensed Program(s) outside of the United States. Aurum has the right to audit Licensee's compliance with these terms and conditions and other provisions of an agreement upon 5 days' written notice and during Licensee's normal business hours."

2.    Paragraph 9 is deleted and replaced in its entirety with the following:

"Aurum represents and warrants that the Licensed Program(s) will operate according to the specifications for the Licensed Program(s) published as of the date of a license granted by Aurum for a period of 90 days from the date of delivery of the Licensed Program(s). If the Licensed Program(s) do not operate according to such specifications, Aurum's responsibility will be to use commercially reasonable efforts, consistent with industry standards, to cure the defect. Aurum also represents and warrants that it can grant the license described in these terms and conditions, that the license will not infringe on any United States letters patent, any trade secret or any copyright, trademark, service mark, trade name or similar proprietary right conferred by common law or by any law of the United States or any state thereof and that it has no knowledge of any existing adverse claim against its right to grant such license."

3.    Paragraph 29 is deleted and replaced in its entirety with the following:

"The laws of the State of South Carolina, excluding its choice of law principles, will govern the relationship between the parties and disputes, differences, controversies or claims directly or indirectly based on an agreement, including those relating to the formation, validity, interpretation, construction, performance, breach, enforceability or termination of an agreement and duties based on tort, contract or statutory concepts."

4.    Paragraph 30 is deleted and replaced in its entirety with the following:

"THE PARTIES HEREBY IRREVOCABLY AGREE THAT NON-EXCLUSIVE JURISDICTION AND VENUE IN ANY ACTION BROUGHT BY ANY PARTY PURSUANT TO AN AGREEMENT WILL LIE IN ANY FEDERAL OR STATE COURT LOCATED IN DALLAS COUNTY, TEXAS. BY EXECUTION AND DELIVERY OF AN AGREEMENT, EACH PARTY, ON BEHALF OF ITSELF AND ITS PERMITTED SUCCESSORS AND ASSIGNS, IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT OVER ITSELF AND ITS PROPERTY WITH RESPECT TO ANY SUCH ACTION. THE PARTIES IRREVOCABLY AGREE THAT VENUE WOULD BE PROPER IN SUCH COURT, AND HEREBY WAIVE ANY OBJECTION THAT SUCH COURT IS AN IMPROPER OR INCONVENIENT FORUM FOR THE RESOLUTION OF SUCH ACTION. THE PARTIES FURTHER AGREE THAT THE MAILING BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, OF ANY PROCESS

(v. 2003.1 SC09 10.9.03)

REQUIRED BY ANY SUCH COURT WILL CONSTITUTE VALID AND LAWFUL
SERVICE OF PROCESS AGAINST THEM, WITHOUT NECESSITY FOR SERVICE BY
ANY OTHER MEANS PROVIDED BY STATUTE OR RULE OF COURT."

5.    A new paragraph 38 is added to the General Terms & Conditions (v. 2003.1) as follows.

"Licensee will not be obligated to pay any travel and travel-related expenses that exceed
in the aggregate more than $80,000.00 and that are incurred by Aurum or on behalf of
Aurum and its personnel in providing (a) the Basic Services and the Supplementary
Services as set forth in sections 2.1 and 2.2 of the MISER Professional Services
Schedule and (b) the Basic Services and the Supplementary Services as set forth in
sections 2.1 and 2.2 of the ViewPoint Branch Automation (BA) Professional Services
Schedule."

| Customer Code | |
|---|---|
| Schedule Number | |

**AURUM TECHNOLOGY INC.**
**LICENSED TECHNOLOGY AGREEMENT**
**MISER SOFTWARE SCHEDULE**

**DESIGNATED SITE**

| 2175 Credit Union Lane | Address at which Licensee may run the Licensed Programs. |
|---|---|
| North Charleston, SC 29406 | |

**DESIGNATED CPU SERIAL NUMBER**

| | To be entered on delivery of Designated CPU to Licensee |
|---|---|

---

**1.    LICENSE TERM**

1.1.    The initial term of the license(s) with respect to the Licensed Programs shall be one (1) year. Thereafter, the License shall be automatically renewed, without requirement for payment by Licensee of an additional license fee, for subsequent one (1) year periods (the renewal term(s)), *provided, however,* Licensee has in effect an agreement with Aurum for maintenance services.

---

**2.    LICENSED PROGRAM(S)**

2.1    **MISER Applications**: The Licensed Program(s) include the following applications (as described in the Aurum Systems documentation) and interfaces referenced in the Professional Services Schedule. The license fee for the Licensed Programs is as follows:

| Applications | | License Fee |
|---|---|---|
| Base MISER3 System | | 690,000.00 |
| Accounts Payable | | Included in Base MISER3 |
| ACH Processing | | Included in Base MISER3 |
| Business Intelligence Application [1] - [2]<br>• REQUIRES CUSTOMER LICENSED CRYSTAL REPORTS | | Included in Base MISER3 |
| Business Intelligence Application<br>• Financial Reporting Module | | 25,000.00 |
| Commercial Loan Servicing<br>• Includes Multiple Participation Module | | Included in Base MISER3 |
| Consumer Loan Servicing | | Included in Base MISER3 |
| Electronic Banking<br>• Home Banking (Digital Insight Module Version 4.0) | | 10,000.00 |
| Fixed Asset Accounting (Best)<br>• Includes FAS Report Writer | 3 Users | 6,500.00 |
| General Ledger | | Included in Base MISER3 |
| Investor Reporting (Mortgage Secondary Market Servicing Module) | | Included in Base MISER3 |

---

[1]    This application includes MISER Data Translation Routines, Report Client (standard user starter report package), and Executive Reporting Module.

[2]    This application includes Sagent Data Movement (1 license), Sagent Data Access Server (1 license), Sagent Automation Studio (1 license), Sagent Analysis and Reporting (20 single source, single target end user licenses) and Attachmate Databridge. These products/licenses may only be used within the Business Intelligence Application.

| Applications | License Fee |
|---|---|
| Mortgage Servicing | Included in Base MISER3 |
| Regular Shares | Included in Base MISER3 |
| Share Drafts | Included in Base MISER3 |
| SmartCOLLECTOR | Included in Base MISER3 |
| SmartPRINT<br>• Includes Forms Packages Applications | Included in Base MISER3 |
| Total License Fee | 731,500.00 |

2.2.   **Licensee Programs**: Licensee must provide the following applications software for use with the Licensed Programs.

2.2.1.   Microsoft Word (for use with SmartWRITER)
2.2.2.   Crystal Reports (for use with Business Intelligence)

2.3.   **Miscellaneous Requirements**: Licensee is responsible for procuring, installing, and maintaining all equipment, telephone lines, communications interfaces, system software and other hardware required to run the Licensed Program(s).

## 3.   LICENSE FEE AND PAYMENT TERMS

3.1   Licensee will pay Aurum for the Services as follows:

For License Programs in accordance with the following schedule.

| Scheduled Payment | Amount |
|---|---|
| On execution of this schedule | 365,750.00 |
| On December 15, 2003 | 365,750.00 |
| Total | 731,500.00 |

Licensee agrees to pay Aurum in accordance with the foregoing payment schedule. The license granted by this agreement is non-cancelable, and amounts paid hereunder are non-refundable except as may be expressly provided in this agreement. Licensee agrees to pay, in addition to the total license fee, all costs incurred by Aurum in delivering the Licensed Program(s) to Licensee.

3.1.3.   Licensee agrees to pay all costs incurred by Aurum in transporting, shipping, or delivering all material associated with the Licensed Programs between Aurum's and Licensee's locations.

Should Licensee desire to increase the processing power of Licensee's Equipment by obtaining a compatible computer with capacity greater than the Designated CPU (the "larger capacity equipment"), Aurum agrees to permit operation of the Licensed Programs on the larger capacity equipment and agrees to charge as a license fee for operation on the larger capacity equipment a relicense fee consistent with relicense fees charged by Aurum to its other Licensees who relicense under similar circumstances.

| Customer Code | |
|---|---|
| Schedule Number | |

**AURUM TECHNOLOGY INC.**
**LICENSED TECHNOLOGY AGREEMENT**
**MISER PROFESSIONAL SERVICES SCHEDULE**

## 1. IMPLEMENTATION SERVICES

1.1.  **Basic Services:** Implementation Services are those services described in Aurum's MISER Implementation Services Guide.

    1.1.1  Licensee will cooperate in the conversion effort and timely provide whatever information, data, clerical and office support, management decisions, approvals, and signoffs Aurum reasonably requires.

1.2.  **Supplementary Services:** Aurum will provide the Supplementary Services listed in section 2.2 related to development, installation, and training on interfaces and Licensed Programs:

## 2. SERVICE FEE AND PAYMENT TERMS

2.1  The fee for the Basic Services will be as follows:

| Basic Services | Service Fee |
|---|---|
| Conversion, Installation, and Training | 125,000.00 |
| Business Plan Development | 30,000.00 |
| Standard Interface Development | In Conversion/Install |
| **Total Basic Services** | |

2.2  The fee for the Supplementary Services will be as follows:

| Supplementary Services | Version[1] | Interface Type | Service Type | Service Fee |
|---|---|---|---|---|
| **Interfaces** | | | | |
| Credit Card Interface | | Batch | Develop/Install/Train | 7,500.00 |
| Hyland COLD Interface | 3.5.4 Build 310 | Batch | Develop/Install/Train | 1,500.00 |
| Mortgageware Interface (Windows Version) | | Batch | Develop/Install/Train | 7,500.00 |
| Palmetto Services Item Processing Interface | | Batch | Develop/Install/Train | In Basic Services |
| Raddon ViewPoint Business Intelligence Interface | 7.1 | Business Intelligence | Develop[2]/Install/Train | 12,500.00 |
| **Total Supplementary Service Charges** | | | | 29,000.00 |

    In additional to the preceding Supplementary Services, Aurum will provide the following General Services, post-Conversion, at a time that is mutually agreeable to the parties.

| General Services | Service Type | Service Fee |
|---|---|---|
| Load First Operating System (OS) Upgrade | Remote OS Load | 1,200.00 |
| Load First MISER Release Upgrade | Remote MISER | 3,000.00 |

---

[1] If the third party product version number is not available when agreement is signed, Customer agrees to provide the version number to Aurum, in writing, no later than Conversion.
[2] Includes three (3) man-days custom programming. Additional custom programming will be billed at $175.00 per man-hour.

| General Services | Service Type | Service Fee |
|---|---|---|
| | Upgrade | |
| System Review (to be scheduled 9-12 months following Conversion) includes:<br>• Consulting Services to assist Licensee in achieving superior performance from the Licensed Programs | Review/Research/ Document | See Footnote[3] |

2.3.    Licensee will pay Aurum for the Basic and Supplementary Services in accordance with the following schedule.

| Scheduled Payment | Amount |
|---|---|
| On the earlier of conversion to the Aurum MISER System or October 15, 2004 | 184,000.00 |
| Total | 184,000.00 |

Licensee will pay Aurum, when billed, for General Services.

Licensee will pay Aurum, when billed, for all actual and reasonable out-of-pocket costs and expenses, including travel and travel-related expenses, that are incurred by Aurum or on behalf of Aurum and its personnel in providing services when incurred at Licensee's request or when required to be provided at Licensee's facility or any other location and for charges incurred in shipping hardware to/from Aurum for initial installation.

Licensee will pay Aurum, when billed, for all costs incurred by Aurum in transporting, shipping, or delivering reports, output, or input between Aurum and Licensee's Facility.

Licensee will pay Aurum, when billed, for all reasonable and actual out of pocket telephone charges including host connection charges incurred by Aurum in rendering services to Licensee under this agreement during the implementation phase.

---

[3]   The parties agree that Customer will schedule four (4) subsequent System Reviews, on a schedule that is mutually agreeable to the parties, for a cost of $12,000.00, plus travel and living expenses, per review.

| Customer Code |  |
|---|---|
| Schedule Number |  |

**AURUM TECHNOLOGY INC.**
**LICENSED TECHNOLOGY AGREEMENT**
**MISER MAINTENANCE SCHEDULE**

## 1.    MAINTENANCE TERM

1.1.   **Term:** The term of the maintenance services with respect to the Licensed Programs shall be five (5) years. Thereafter, Licensee shall maintain a maintenance agreement, in full force and effect, so long as Licensee desires to retain a license for the Licensed Programs.

## 2.    MAINTENANCE SERVICES

2.1    **Revisions and Updates:**    Aurum will provide Licensee with all revisions, upgrades and enhancements that are generally made available to other users of MISER3 and the Maintained Programs as set forth below. Aurum will use commercially reasonable efforts to produce such revisions, upgrades and enhancements so that MISER3 and the Maintained Programs will allow Licensee to comply with Federal laws, rules and regulations as the same may be amended or replaced from time to time.

2.2.    **Telephone Support:**  Aurum will provide telephone support by toll free number for questions concerning or problems with the use of the Licensed Programs in accordance with Aurum's published Call Support Guidelines.

2.3.    **Licensee Responsibilities:**  Licensee will maintain the proper operating environment for the Licensed Programs and follow Aurum's procedures and instructions for operator maintenance and obtaining services. Licensee will provide adequate working and storage space for use by Aurum personnel near the equipment for maintenance purposes, provide Aurum access to the equipment and sufficient computer time, subject only to Licensee's security rules, provide data required for diagnostics, including in machine readable form, if requested and reproduce suspected errors or malfunctions in the Licensed Programs. Licensee will install available error corrections and maintenance releases on a current basis.

2.4.    **Access:** Licensee will provide Aurum or its subcontractors with appropriate systems access remotely to the Licensed Programs for the purpose of permitting development, maintenance and support of the Licensed Programs. Appropriate systems access to the host application is deemed to be dial-in access to the Licensee's Designated CPU. Aurum or its subcontractors will be provided access, including operator ID with passwords, and test accounts if required. Access to the Licensed Programs is to be provided to Aurum or its subcontractors on a scheduled basis for the provision of support and maintenance services.

## 3.    MAINTAINED PROGRAM(S)

3.1    **Base System:** The Licensed Program(s) include the following applications (as described in the Aurum Systems documentation) and interfaces referenced in the Professional Services Schedule. The maintenance fee for the Licensed Programs is as follows:

| Application | Annual Maintenance |
|---|---|
| Base MISER3 System | 156,000.00 |
| Accounts Payable | Included in Base MISER3 |
| ACH Processing | Included in Base MISER3 |
| Business Intelligence Base Module | Included in Base MISER3 |
| •    Includes Executive Reporting Module |  |

| Application | Annual Maintenance |
|---|---|
| Business Intelligence Financial Reporting Module | 5,000.00 |
| Commercial Loan Servicing | Included in Base MISER3 |
| Consumer Loan Servicing | Included in Base MISER3 |
| Electronic Banking<br>•   Home Banking (Digital Insight Module) | 2,000.00 |
| Fixed Asset Accounting | 1,300.00 |
| General Ledger | Included in Base MISER3 |
| Investor Reporting (Mortgage Secondary Market Servicing) | Included in Base MISER3 |
| Mortgage Servicing | Included in Base MISER3 |
| Regular Shares | Included in Base MISER3 |
| Share Drafts | Included in Base MISER3 |
| Smart COLLECTOR | Included in Base MISER3 |
| Smart Print | Included in Base MISER3 |
|  |  |
| Credit Card Interface | 1,500.00 |
| Hyland COLD Interface | 300.00 |
| Mortgage Origination Interface (Mortgageware) | 1,500.00 |
| Palmetto Services Item Processing Interface | Included in Base MISER3 |
| Raddon ViewPoint Business Intelligence Interface | 2,500.00 |
| **Total Annual Charges** | **170,100.00** |

**3.2.**    **Additional Functionality:** Aurum will provide Licensee with the following additional functionality as part of the maintenance services provided herein:

3.2.1.  Credit Union account number generation as provided below:
♦   Aurum will provide an account numbering structure that incorporates the primary share/member account number for all open and future products for the member according to mutually agreeable specifications developed by Licensee and Aurum.
♦   As an example, when creating the CIF/Member Account Number MISER will generate a random number based on the institution's criteria. When products are created, MISER will incorporate the CIF/Member Account Number as the prefix and generate a random number to create the product account number.
♦   Functionality to be delivered to Licensee prior to conversion to Aurum Systems to allow for adequate testing.
♦   Automatic account linking will occur as part of the workflow.

## 4.    PAYMENT TERMS

**4.1.**    Licensee will pay Aurum for the Services as follows:

For Maintenance Programs in accordance with the following schedule:

| Scheduled Payment | Amount |
|---|---|
| On Conversion to Aurum Systems | 170,100.00 |
| Payment for subsequent years will be billed on the first of the month prior to the anniversary of Conversion to Aurum Systems. | |

Aurum may, with 60 days' prior written notice to Licensee, increase the fees and charges listed in this schedule once in each year after the first year of this agreement; but Aurum may not in any year increase them more than 5%.

4.1.3.  In addition to the foregoing, Aurum may also, with 60 days' prior written notice to Licensee, increase the maintenance fees and charges listed in this schedule once in each year after the first year of this agreement in accordance with the following table (Licensee's asset base, as reported to the National Credit Union Administration, will be used to determine whether an increase is allowable hereunder).

| If Licensee's total assets are: | Cumulative Percentage Increase |
|---|---|
| • $1.2 billion or greater, the then current maintenance will be increased by: | 3% |
| • $1.5 billion or greater, the then current maintenance will be increased by: | 3% |
| • $1.8 billion or greater, the then current maintenance will be increased by: | 3% |
| • $2.1 billion or greater, the then current maintenance will be increased by: | 3% |

| Customer Code |  |
| Schedule Number |  |

**AURUM TECHNOLOGY INC.**
**LICENSED TECHNOLOGY AGREEMENT**
**MISER HARDWARE/SOFTWARE PURCHASE SCHEDULE**

## 1.  PRODUCT PURCHASE

1.1    Licensee will purchase from Aurum, and Aurum will sell to Licensee, certain hardware and software products (collectively, the "Products") described in the Equipment Information and Software Information Product Schedule of the Warranty and User Software License Agreement (the "Unisys Agreement"), a copy of which Unisys Agreement is attached hereto and incorporated herein by this reference.

    1.1.1    In addition to the Products described in the Unisys Agreement, Aurum will provide the following services which will be carried out by Unisys Corporation, as agent for Aurum.

| Style Number | Service Description |
|---|---|
| CSS1-TCS | Imp Services Partition 1 |
| STO92202-INS | SERV: 16-Port Fiber Channel |
| STO92202-INS | SERV: 16-Port Fiber Channel |

1.2.    Licensee will pay Aurum for the Hardware/Software Products in accordance with the following schedule.

| Scheduled Payment | Amount |
|---|---|
| On execution of this schedule | 706,235.00 |
| On shipment of the Designated CPU to Licensee | 706,235.00 |
| Total Payments | 1,412,470.00 |

1.3.    Licensee will pay Aurum, when billed, for all costs incurred by Aurum in transporting, shipping, or delivering all material associated with the Products between Aurum, Unisys Corporation ("Unisys") and Licensee's locations.

Maintenance for the Products will be provided by Unisys pursuant to a separate agreement between Licensee and Unisys, if Licensee and Unisys elect to enter into such agreement.

1.5.    Aurum warrants that Licensee will have good title to the Products, free and clear of all liens and encumbrances.

1.6.    Licensee agrees to accept delivery of the Hardware/Software Products on or before December 31, 2004 at Aurum's service center in Charlotte, NC.

**EXCEPT AS SET FORTH ABOVE, AURUM MAKES NO OTHER WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE PRODUCTS.**

1.8.    This Agreement is expressly conditioned upon acceptance of the Unisys Agreement by Unisys.

| Customer Code |  |
|---|---|
| Schedule Number |  |

### AURUM TECHNOLOGY INC.
### LICENSED TECHNOLOGY AGREEMENT
### VIEWPOINT BRANCH AUTOMATION (BA) SOFTWARE SCHEDULE

## 1.  LICENSE TERM

The initial term of the license(s) with respect to the Licensed Programs shall be one (1) year. Thereafter, the License shall be automatically renewed, without requirement for payment by Licensee of an additional license fee, for subsequent one (1) year periods (the renewal term(s)), *provided, however,* Licensee has in effect an agreement with Aurum for maintenance services.

## 2.  LICENSED PROGRAM(S)

**ViewPoint Branch Automation (BA) Applications:** The Licensed Program(s) include the following applications (as described in the Aurum Systems documentation) and interfaces referenced in the ViewPoint BA Professional Services Schedule. The license fee for the Licensed Programs is as follows:

| Applications | Quantity | License Fee |
|---|---|---|
| Aurum ViewPoint™ Branch Automation<br>•   Browser-based teller, platform, call center- and back-office system | 360 | 342,000.00 |
| Aurum ViewPoint MRM Campaign Manager (Branch channel) | 1 | 40,000.00 |
| Aurum ViewPoint Sales Manager | 1 | 25,000.00 |
| Nexus XSFConnect | 420 | 42,000.00 |
| Aurum ViewPoint™ Branch Automation<br>•   Browser-based Training Workstations<br>Seats are to be used for training purposes only.<br>Seats may not be used for production purposes. | 40 | 20,000.00 |
| Subtotal | | 469,000.00 |
| Aurum New Customer Discount | | -65,000.00 |
| **Total Applications** | | **404,000.00** |

2.2.    The parties agree there will be no charge for ViewPoint Branch Automation Seats utilized for training and testing.

## 3.  MISCELLANEOUS REQUIREMENTS)

**Licensee Programs:** Licensee must provide the following applications software for use with the Licensed Programs.

3.1.1.    Crystal Reports
3.1.2.    Adobe/Jetforms
3.1.3.    Nexus XSFConnect

**Equipment:** Licensee is responsible for procuring, installing and maintaining all equipment, telephone lines, communications interfaces, system software and other hardware required to run ViewPoint Branch Automation, unless Aurum is contracted to provide and install all hardware. Licensee is responsible for purchasing the hardware and system software recommended below. Licensee is responsible for installing all system software and shipping servers to Aurum for installation of ViewPoint Branch Automation

3.2.1.   The recommended hardware must be from IBM, Unisys, Dell or HP [1] (the foregoing must operate on Intel processors). A sample hardware and software environment for ViewPoint Branch Automation is as follows:

| Qty. | Hardware |
|---|---|
| | Pentium Dual processor 2.0 GHz , 512 cache motherboard/CPU combo. Onboard Ethernet adapter, RAID controller (RAID 5 setup).* |
| 1 | 1 GB of RAM (2 sticks of 512M preferred) *** |
| 3 | 36GB, 10K rpm hot swap SCSI hard drives |
| 1 | PERC4-SC, 32MB SCSI Controller |
| 1 | FV100T 4mm DDS-4 Internal Tape Drive w/Controller, w/ TapeWare Software |
| 1 | Intel Pro 100S w/ IPSEC Network Adapter |
| 1 | 48X CD-ROM |
| 1 | Set of: 15" Monitor, keyboard & mouse |
| **Qty.** | **Software** |
| | Microsoft Windows 2000 Server License |
| 1 | Microsoft Windows 2000 Server Media Kit with service pack 3 |
| 360 | Microsoft Windows 2000 Server Client Access License** |
| 1 | Microsoft SQL Server 2000 - Server License |
| 1 | Microsoft SQL Server 2000 – Media Kit |
| 360 | Microsoft SQL Server 2000 – Client Access License** |
| 1 | Backup s/w |
| **Ref.** | **Footnote** |
| * | As an alternative an additional pair of 8 or 10 GB, 10Krpm SCSI hard drives could be set up as RAID 1 (mirrored) to house only the OS. These would also have to be hot-swappable. This RAID 1 + RAID 5 setup is recommended. Licensee may also an external tower which contains the hard drives which would be on their own power source and thus independent from a failure in the main server. |
| ** | Can be done through single seat CALs or through Per Processor CALs based on Licensee's Microsoft s/w agreement. |
| *** | This memory configuration comes from Dell with 256MB of DIMM Memory.  The recommended additional memory may be purchased through any reliable source. |

| Qty*. | Hardware |
|---|---|
| 5 | Pentium 4 2.4 GHz , 512 cache motherboard/CPU combo with Floppy / CDROM. |
| 5 | 512KRAM |
| 5 | Intel 100 Dual Port Network Adapter |
| 5 | Motherboard IDE 40GB 7.2K RPM Hard Drive |
| 5 | RapidRails for Dell Rack |
| **Qty.** | **Software** |
| 5 | Windows 2000 Server w/IIS |
| **Ref.** | **Footnote** |
| * | This is the estimated quantity. Actual quantity will be determined based on number |

Customer may utilize CPUs from other vendors not included herein; however, if a problem occurs with such CPUs that cannot be replicated on the recommended environment CPU, then such use will be deemed to have voided the limited warranty provided in this agreement.

| Application Server 1 Specifications | |
|---|---|
| | and location of stations, transactions volumes and other factors. |

| Backup/Training Application Server 2 Specifications | |
|---|---|
| **Qty.** | **Hardware** |
| 2 | Dell PowerEdge 650 2.4 GHz Intel Pentium 4, 512 cache motherboard/CPU combo with Floppy / CDROM. |
| 2 | 1 GB of RAM (2 sticks of 512MB preferred) * |
| 2 | Intel 100 Dual Port Network Adapter |
| 2 | Motherboard IDE 40GB 7.2K RPM Hard Drive |
| 2 | RapidRails for Dell Rack |
| **Qty.** | **Software** |
| 2 | Windows 2000 Server w/IIS |
| **Ref.** | **Footnote** |
| * | This is the estimated quantity. Actual quantity will be determined based on number and location of stations, transactions volumes and other factors. |

| Workstation Specifications | |
|---|---|
| **Qty.** | **Hardware** |
| 360 | Windows 2000 PC Intel Pentium II 300 MHz or faster processor |
| 360 | 2 GB of disk |
| 360 | 96 MB of memory |
| 360 | Keyboards, monitors, Ethernet cards, Mouse |
| **Qty.** | **Software** |
| 360 | Microsoft Message Queuing Services (MSMQ) |
| 360 | Microsoft Internet Explorer 6.0 |
| 360 | Microsoft Office (optional) |

Supported printers include any financial printer supported by the currently supported version of Nexus XFSConnect.
Supported networks include Windows NT.

---

**4.    LICENSE FEE AND PAYMENT TERMS**

4.1.    Licensee will pay Aurum for the Services as follows:

For Licensed Programs in accordance with the following schedule:

| Scheduled Payment | Amount |
|---|---|
| On execution of this schedule | 202,000.00 |
| On December 15, 2003 | 202,000.00 |
| Total | 404,000.00 |

All costs incurred by Aurum in transporting, shipping, or delivering all material associated with the Licensed Programs between Aurum and Licensee's locations.

| Customer Code |  |
|---|---|
| Schedule Number |  |

**AURUM TECHNOLOGY INC.**
**LICENSED TECHNOLOGY AGREEMENT**
**VIEWPOINT BRANCH AUTOMATION (BA) PROFESSIONAL SERVICES SCHEDULE**

## 1.   IMPLEMENTATION SERVICES

1.1     **Standard Implementation:** Aurum offers a pre-defined standard implementation package for a fixed fee for installing the standard product without customization. The services included in this package are:

1.1.1   **Project Management:** Project Management activities include planning the project, resource management and scheduling, risk identification and management, status reporting, monitoring deliverables, obtaining acceptance documents, and managing change control. Project Management services begin with the project kickoff. During the project kickoff meeting, Aurum and Licensee will review the project contracts, Licensee responsibilities, Licensee resources and the project plan.

**Standard ViewPoint Branch Automation Lab Setup:** Aurum will prime servers by installing ViewPoint Branch Automation on an initial set of servers at an Aurum facility. Aurum will install ViewPoint Branch Automation on workstations that will be used in laboratory environments.

**Teller Baseline Identification and Parameterization:** This includes an interview session(s) intended to review and collect information required for proper configuration of the teller system to be installed for acceptance testing. Services include the setup and system test of parameter files and system initialization files.

1.1.4.   **Product, Rate and Employee Upload Verification:** This includes the validation of the import of products definitions, rates and employee data from the host system into ViewPoint Branch Automation.

1.1.5.   **Trial Host Data Load:** This service will provide the Licensee's implementation team programs and instruction on loading and refreshing customer and account data from the host system to the ViewPoint Branch Automation database.

1.1.6.   **Fail over (Backup) Implementation and Support:** Aurum will provide the Licensee's personnel assistance and support in the implementation of their server fail over plan. Database clustering is not included in this service.

1.1.7   **Acceptance Testing Support:** Aurum will provide Licensee phone and e-mail support during the acceptance testing period.

**Ready For Pilot Procedure Review and Pilot Branch Support:** Aurum will conduct a conference call with appropriate Licensee personnel to review a prescribed set of procedures to verify, from an operational standpoint, that the Licensee is ready to go to production at its initial installation facility.

**ViewPoint Branch Automation Software Installation Instruction:** Aurum will provide training to the Licensee's technical personnel to assist them with the installation and replication of ViewPoint Branch Automation on additional equipment. It is anticipated that the Licensee will set up additional workstations and servers that can be used for training, acceptance testing, and the system initial installation. Aurum will also provide instruction in the application of updates to ViewPoint Branch Automation.

1.1.10.  **System Administration Training:** Aurum will provide basic system administration training on the system architecture and maintenance of the database.

1.1.1    **Train the Trainer Class:** Aurum will provide "train-the-trainer" training to Licensee's personnel responsible for training all other Licensee personnel.

1.1.12. Post Implementation Review: Aurum's project manager will conduct a post implementation meeting with the Licensee.

1.1.13. On-site Support: Aurum will provide on-site support for up to 10 days to perform the project kick-off meeting, gather information, load data and setup the system. Aurum will provide on-site training for up to 5 days to perform "train-the-trainer" and system administration training. Aurum will provide on-site initial installation support for up to 5 days of live production implementation. Additional on-site assistance beyond the above will be provided at Aurum's then current professional services rates.

1.2. **Licensee Responsibilities**

1.2.1 Licensee will assign a project manager who will interact with Aurum's project manager to coordinate and manage all activities of the implementation for the Licensee. The project manager must have the authority to act and make decisions on behalf of the Licensee.

Licensee will provide technical and business resources as required to participate in the implementation project plan as required by Aurum's project manager.

1.2.3. Licensee will provide Aurum or its subcontractors with appropriate systems access remotely to ViewPoint Branch Automation and related host applications for the purpose of permitting installation of ViewPoint Branch Automation.

1.2.3.1. Appropriate systems access to the host application is deemed to be dial-in access to the Licensee's host. Aurum or its subcontractors shall be provided access, including operator ID with passwords, and test accounts if required. Access to the host application is to be provided to Aurum or its subcontractors from the start of implementation through conversion of the Licensee's first branch.

1.2.3.2. Appropriate systems access to ViewPoint Branch Automation is deemed to be dial-in access to the Licensee's facility with a modem or VPN access and containing ViewPoint Branch Automation and a licensed copy of PC-Anywhere (or similar product).

Licensee shall reimburse Aurum for all reasonable and actual out of pocket telephone charges including host connection charges incurred by Aurum in rendering services to Licensee under this agreement during the implementation phase.

1.3. **Additional Services:** Aurum will perform the following specific additional services as listed:

| | Additional Service | Estimated Days[1] |
|---|---|---|
| 1.3.1. | Forms set-up and training. | First 5 forms can be set up in a training class environment. Estimate is 2 – 3 days per form initially. |
| 1.3.2. | Interface card swipes. | Estimated at 10 days. Card swipe devices selected must be supported by Nexus. |
| 1.3.3. | Integrate pictures for Member ID to provide the ability to view the member's picture via ViewPoint. | If the vendor has a browser based API, estimated at 3-4 days. |
| 1.3.4. | Viewpoint Authoring Training. | Estimated 5 days training on-site or $1,000 per person for a scheduled class in Orlando. |
| 1.3.5. | Design additional workflows. | Custom workflows will be built as described in Other Services. Alternatively, Aurum will train on building workflows, which is roughly a 2-5 day effort. |

---

[1] Days quoted are estimates only. Actual days will be provided to, and signed-off by the customer after business and functional requirements are defined.

| | Additional Service | Estimated Days[1] |
|---|---|---|
| 1.3.6. | Authentication using Novell developed and ready upon software delivery for testing in real environment. | Estimated 18 days for changing the impersonate component in ViewPoint from using Windows authentication to using Novell authentication. Any additional changes, if required, will be chargeable as described in Other Services. |
| 1.3.7. | Integrate to Lefebure Teller Cash Dispensers. To be developed and ready for testing in real environment prior to live day. | Estimated at 20-25 day effort . |
| 1.3.8. | Provide starter check interface to have starter and temp checks printed via Viewpoint on a MICR laser at each branch, pre-filling the name and address, prompting for first check number, and filling in the MICR line on the check. Aurum will create a new "form" and a transaction prompt on ViewPoint and send it to a device that can print MICR code. Form to be setup using a third-party product to setup MICR print. Checks would print to a laser printer supported by Nexus with a MICR cartridge. | Estimated at 3-5 days. Cost of third party product will be billed separately. |

1.4.    **Other Services:**  Other optional services such as additional branch implementations, custom authoring, building custom workflows, custom linking of transactions, integration or development of custom forms and documents, consulting services, additional training services, custom programming or custom interfaces are not included in the standard implementation services and may be contracted separately.

## 2.    CHARGES FOR SERVICES

2.1    **Basic Services:** Aurum will provide the following Basic Services related to conversion, installation, and training on Licensed Programs. The fee for the Basic Services will be as follows:

| Basic Services | Service Fee |
|---|---|
| Conversion, Installation, and Training | 50,000.00 |

2.2.    **Supplementary Services:** Aurum will provide the following Supplementary Services related to development, installation, and training on interfaces and Licensed Programs. The fee for the Supplementary Services will be as follows:

| Supplementary Service | Version[2] | Interface Type | Service Type | Service Fee |
|---|---|---|---|---|
| Interfaces | | | | |
| Harland Check Order Interface | 31 EOY EP2.1 | Online | Develop/Install/Train | 7,500.00 |
| Signature Pad/Doc Retrieval Interface<br>• Using a signature pad supported by Nexus, provide the ability to capture the member's signature and attach it to the system generated document.<br>• Documents will be sent to the Hyland OnBase Optical system for indexing and storage.<br>• Provide the capability to display documents stored on the Hyland Onbase system through Viewpoint. | | Online | Develop/Install/Train | 28,000.00 |

---

[2]    If the third party product version number is not available when agreement is signed, Customer agrees to provide the version number to Aurum, in writing, no later than Conversion.

| Supplementary Service | Version[2] | Interface Type | Service Type | Service Fee |
|---|---|---|---|---|
| APPRO – New Account Opening<br>• As part of Opening the New Member Account in Viewpoint, Viewpoint will send the necessary member information to APPRO so that APPRO can perform the Equifax Credit Check and OFAC Check.<br>• APPRO will use the credit report and the SC FCU's criteria to determine what loan products to cross sell. Cross Sell items will be returned to ViewPoint and displayed. | | Online | Develop/Install/Train | 20,000.00 |
| Telecheck | | Online | Develop/Install/Train | 15,000.00 |
| Total Supplementary Services | | | | 70,500.00 |

**Additional Services:** Aurum will provide additional services described in section 1.3 of this schedule at a rate of $175.00 per man-hour (8 hour day) through 180 days following conversion. Thereafter, the fee for other services shall be at Aurum's then current rate.

2.4.    **Other Services:** Aurum will provide other services described in section 1.4 of this schedule at a rate of $175.00 per man-hour through 180 day following conversion. Thereafter, the fee for other services shall be at Aurum's then current rate.

## 3.    SUMMARY OF CHARGES

Licensee will pay Aurum for the Services as follows:

3.1.    Licensee will pay Aurum for Implementation Services in accordance with the following schedule.

| Scheduled Payment | Amount |
|---|---|
| On the earlier of conversion to the Aurum MISER System or October 15, 2004 | 120,500.00 |
| Total | 120,500.00 |

3.1.2.    Licensee will pay Aurum, when billed, for additional services and other services.

3.1.3.    Licensee will pay Aurum, when billed, for all actual and reasonable out-of-pocket costs and expenses, including travel and travel-related expenses, that are incurred by Aurum or on behalf of Aurum and its personnel in providing services when incurred at Licensee's request or when required to be provided at Licensee's facility or any other location and for charges incurred in shipping hardware to/from Aurum for initial installation.

3.1.4.    Licensee will pay Aurum, when billed, for all costs incurred by Aurum in transporting, shipping, or delivering reports, output, or input between Aurum and Licensee's Facility.

3.1.5.    Licensee will pay Aurum, when billed, for all reasonable and actual out of pocket telephone charges including host connection charges incurred by Aurum in rendering services to Licensee under this agreement during the implementation phase.

| Customer Code |  |
|---|---|
| Schedule Number |  |

## AURUM TECHNOLOGY INC.
## LICENSED TECHNOLOGY AGREEMENT
### VIEWPOINT BRANCH AUTOMATION (BA) MAINTENANCE SCHEDULE

| 1. | MAINTENANCE TERM |
|---|---|

1.1    **Term:** The term of the maintenance services with respect to the Licensed Programs shall be five (5) years. Thereafter, Licensee shall maintain a maintenance agreement, in full force and effect, so long as Licensee desires to retain a license for the Licensed Programs.

| 2. | MAINTENANCE SERVICES |
|---|---|

2.1    **Revisions and Updates:**    Aurum will provide Licensee with all revisions, upgrades and enhancements that are generally made available to other users of ViewPoint Branch Automation.

2.2.    **Telephone Support:** Aurum will provide telephone support by toll free number for questions concerning or problems with the use of ViewPoint Branch Automation in accordance with Aurum's published Call Support Guidelines.

2.3    **Licensee Responsibilities:** Licensee will maintain the proper operating environment for ViewPoint Branch Automation and follow Aurum's procedures and instructions for operator maintenance and obtaining services. Licensee will provide adequate working and storage space for use by Aurum personnel near the equipment for maintenance purposes, provide Aurum access to the equipment and sufficient computer time, subject only to Licensee's security rules, provide data required for diagnostics, including in machine readable form, if requested and reproduce suspected errors or malfunctions in ViewPoint Branch Automation. Licensee will install available error corrections and maintenance releases on a current basis.

2.4.    **Access:** Licensee will provide Aurum or its subcontractors with appropriate systems access remotely to ViewPoint Branch Automation and related host applications for the purpose of permitting development, maintenance and support of ViewPoint Branch Automation.

Appropriate systems access to the host application is deemed to be dial-in access to the Licensee's host. Aurum or its subcontractors will be provided access, including operator ID with passwords, and test accounts if required. Access to the host application is to be provided to Aurum or its subcontractors on a scheduled basis for the provision of ViewPoint Branch Automation support and maintenance services.
Appropriate systems access to ViewPoint Branch Automation is deemed to be dial-in access to the Licensee's facility with a modem or VPN access and containing ViewPoint Branch Automation and a licensed copy of PC-Anywhere (or similar product). Access to ViewPoint Branch Automation is to be provided to Aurum or its subcontractors from the initial installation throughout the term of this agreement.

| 3. | MAINTAINED PROGRAM(S) |
|---|---|

3.1.    **ViewPoint Branch Automation (BA) Applications:** The Licensed Program(s) include the following applications (as described in the Aurum Systems documentation) and interfaces referenced in the Professional Services Schedule. The maintenance fee for the Licensed Programs is as follows:

| Application | Quantity | Annual Maintenance |
|---|---|---|
| Aurum ViewPoint™ Branch Automation |  |  |
| •    Browser-based teller, platform, call center, back-office system | 360 | 75,600.00 |

| Application | Quantity | Annual Maintenance |
|---|---|---|
| Aurum ViewPoint MRM Campaign Manager | 1 | 8,000.00 |
| Aurum ViewPoint Sales Manager | 1 | 5,000.00 |
| Nexus XSFConnect | 420 | 8,400.00 |
| Harland Check Order Interface | NA | 1,500.00 |
| Signature Pad/Doc Retrieval Interface | NA | 5,600.00 |
| APPRO – New Account Opening | NA | 4,000.00 |
| Telecheck | NA | 3,000.00 |
| Aurum ViewPoint™ Branch Automation<br>• Browser-based Training Workstations<br>Seats are to be used for training purposes only. Seats may not be used for production purposes. | 40 | 4,000.00 |
| Subtotal | | 115,100.00 |
| Aurum New Customer Discount | | -13,000.00 |
| Total Annual Charges | | 102,100.00 |

**3.2.**  **Additional Functionality:** Aurum will provide Licensee with the following additional functionality as part of the maintenance services provided herein:

4.1.2  Provide an option to suppress the balance on a receipt for a non-member
   ♦  Functionality to be delivered to Licensee by conversion to Aurum Systems.

4.1.2  Show both sides of a general ledger transaction when viewing general ledger history
   ♦  Functionality to be delivered to Licensee by the first release of Aurum Systems in 2005.

## 4.    PAYMENT TERMS

**4.1**  Licensee will pay Aurum for the Services as follows:

For Maintenance Programs in accordance with the following schedule:

| Scheduled Payment | Amount |
|---|---|
| On Conversion to Aurum Systems | 102,100.00 |
| Payment for subsequent years will be billed on the first of the month prior to the anniversary of Conversion to Aurum Systems. | |

Aurum may, with 60 days' prior written notice to Licensee, increase the fees and charges listed in this schedule once in each year after the first year of this agreement; but Aurum may not in any year increase them more than 5%.

In addition to the foregoing, Aurum may also, with 60 days' prior written notice to Licensee, increase the maintenance fees and charges listed in this schedule once in each year after the first year of this agreement in accordance with the following table (Licensee's asset base, as reported to the National Credit Union Administration, will be used to determine whether an increase is allowable hereunder).

| If Licensee's total assets are: | Cumulative Percentage Increase |
|---|---|
| • $1.2 billion or greater, the then current maintenance will be increased by: | 3% |
| • $1.5 billion or greater, the then current maintenance will be increased by: | 3% |
| • $1.8 billion or greater, the then current maintenance will be increased by: | 3% |
| • $2.1 billion or greater, the then current maintenance will be increased by: | 3% |

**AURUM TECHNOLOGY INC.**
**SOFTWARE LICENSE AGREEMENT**
**SOFTWARE SCHEDULE**
**FOR**
**AURUM TELEPHONE BANKING SYSTEM**

**Licensed Program(s):**

<u>Aurum Supplied Software</u>
Aurum Telephone Banking Application – The Aurum Telephone Banking Application provides financial institution customers 24/7 access to their account information, enabling users to perform banking transactions on their schedule, without the assistance of financial institution personnel.

<u>Third Party Supplied Software</u>
Microsoft Windows 2000 Server – Operating system. (2 licenses)

Symantec Ghost V7 Software Utility – System backup software. (2 licenses)

pcAnywhere Host Only, v10  - Remote access software. (2 licenses)

License for IVR Agent (60 Ports) - Primary IVR port licenses that support the current features offered by Intervoice.

Enabling Agent, Domestic - Provides software integration. (2 licenses)

Software and License for InterSoft Version 3 - Call processing software. (2 licenses)

USA T1 – Provides loads and protocols necessary to support Digital connectivity. (2 licenses)

InnerView Local - Reporting software providing detailed historical reporting on an individual IVR. (2 licenses)

Multi-Port Fax, Transmit or Receive (3P) - Provides transmit or receive facsimile capability on a Omvia system. (2 licenses)

Telnet VT100/220/340/420 - Provides up to 96 host sessions. (2 licenses)

Omvia Media Server M200 Quick Reference – Server documentation. (2 licenses)

Technical Documentation Information – Intervoice product documentation. (2 licenses)

**License Term:**

<u>Aurum Supplied Software</u> - One year, which term will be automatically renewed for 1-year terms thereafter, without requirement for payment by Licensee of an additional license fee, *provided, however,* Licensee has in effect an agreement with Aurum for maintenance services.

<u>Third Party Supplied Software</u> – Perpetual license. Licenses are valid only for use with the major release of InterSoft that has been purchased. Upgrading to a new major release of InterSoft will require additional license fee, unless customer subscribes to the Software Services Program (SSP).

**License Fee and Payment Terms:**

| | |
|---|---|
| Aurum Supplied Software: | Included in the Hardware Purchase Schedule |
| Third Party Supplied Software: | Included in the Hardware Purchase Schedule |

(v.2003.1 SC09 10.24.03)

**AURUM TECHNOLOGY INC.**
**SOFTWARE LICENSE AGREEMENT**
**PROFESSIONAL SERVICES SCHEDULE**
**FOR**
**AURUM TELEPHONE BANKING SYSTEM**

**Professional Services:**

Standard Implementation: Aurum offers a pre-defined standard implementation package for a fixed fee for installing the standard product without customization. The services included in this package are:

> Project Management
> Project Management activities include planning the project, resource management and scheduling, risk identification and management, status reporting, monitoring deliverables, obtaining acceptance documents, and managing change control. Project Management services begin with the project kickoff. During the project kickoff meeting, Aurum and Licensee will review the project contracts, Licensee responsibilities, Licensee resources and the project plan.

> Standard Server Configuration
> Aurum will prepare server(s) by installing and configuring the Aurum and Vendor supplied software on the voice response unit.

> Acceptance Testing Support
> Aurum will provide Licensee phone and e-mail support during the acceptance testing period.

> System Administration Training
> Aurum will provide basic system administration training on the voice response unit.

> Installation Support
> Aurum will provide Licensee phone and e-mail support during server installation, unless contracted to provide onsite support.

> Post Implementation Review
> Aurum's project manager will conduct a post implementation meeting with the Licensee.

> Professional Voice Recording
> Up to two hours of professional voice recording for customized English and Spanish messages is included. Additional professional voice recording will be quoted at then current rates.

**Licensee Responsibilities:**

Licensee will assign a project manager who will interact with Aurum's project manager to coordinate and manage all activities of the implementation for the Licensee. The project manager must have the authority to act and make decisions on behalf of the Licensee.

Licensee will provide technical and business resources as required to participate in the implementation project plan as required by Aurum's project manager.

Licensee will provide Aurum or its subcontractors with appropriate systems access remotely to the voice response unit and related host applications for the purpose of permitting installation of the Aurum Telephone Banking System.

(v. 2003.1 SC09 10.24.03)

Aurum or its subcontractors shall be provided access to test accounts if required. Access to the host application and test accounts is to be provided to Aurum or its subcontractors from throughout implementation.

Licensee will reimburse Aurum for all reasonable and actual out of pocket telephone charges including host connection charges incurred by Aurum in rendering services to Licensee under this agreement during the implementation phase.

**Other Services:**

Other optional services such as integration or development of additional features, consulting services, additional training services, custom programming or custom interfaces are not included in the standard implementation services and may be contracted separately.

**Pricing and Payment Terms:**

Standard Implementation Services:        $ 9,000.00

Payment Schedule:                        $ 9,000.00    due upon execution of this agreement.

Licensee will also pay Aurum, when billed, for all actual and reasonable out-of-pocket costs and expenses, including travel and travel-related expenses, that are incurred by Aurum or on behalf of Aurum and its personnel in providing services when incurred at Licensee's request or when required to be provided at Licensee's facility or any other location and for charges incurred in shipping hardware to/from Aurum for initial installation.

**AURUM TECHNOLOGY INC.**
**SOFTWARE LICENSE AGREEMENT**
**MAINTENANCE SCHEDULE**
**FOR**
**AURUM TELEPHONE BANKING SYSTEM**

**Maintenance Services:**

Revisions and Updates:

>  Aurum Supplied Software - Aurum will provide Licensee with all revisions, upgrades and enhancements that are generally made available to other users of the Aurum Telephone Banking System.

>  Third Party Supplied Software -- Aurum will provide Licensee with all revisions, upgrades and enhancements that are generally made available to other users of an Intervoice voice response unit.

Hardware Support: Aurum or its subcontractors will provide hardware maintenance for the voice response unit hardware, in the event of a component failure.

Telephone Support: Aurum will provide telephone support by toll free number for questions concerning or problems with the use of the Aurum Telephone Banking System in accordance with Aurum's published Call Support Guidelines.

Licensee Responsibilities: Licensee will maintain the proper operating environment for the Aurum Telephone Banking System and follow Aurum's procedures and instructions for operator maintenance and obtaining services. Licensee will provide adequate working and storage space for use by Aurum personnel near the equipment for maintenance purposes, provide Aurum access to the equipment and sufficient computer time, subject only to Licensee's security rules, provide data required for diagnostics, including in machine readable form, if requested and reproduce suspected errors or malfunctions in the Aurum Telephone Banking System. Licensee will install available error corrections and maintenance releases on a current basis.

Licensee will provide Aurum or its subcontractors with appropriate systems access remotely to the Aurum Telephone Banking System and related host applications for the purpose of permitting development, maintenance and support of the Aurum Telephone Banking System.

Licensee will provide Aurum or its subcontractors with appropriate systems access remotely to the voice response unit and related host applications for the purpose of permitting installation of the Aurum Telephone Banking System.

Aurum or its subcontractors shall be provided access to test accounts if required. Access to the host application and test accounts is to be provided to Aurum or its subcontractors from throughout implementation.

**Maintenance Fees and Payment Terms:**

| Maintenance Fee: | $ 7,500.00 | for first year |
| | $ 14,347.69 | annually for subsequent years |
| | | |
| Payment Schedule: | $ 7,500.00 | due upon execution of this agreement |
| | $ 14,347.69 | annually beginning year two |

(v.2003.1 SC09 10.24.03)

**AURUM TECHNOLOGY INC.**
**SOFTWARE LICENSE AGREEMENT**
**HARDWARE PURCHASE SCHEDULE**
**FOR**
**AURUM TELEPHONE BANKING SYSTEM**

**Hardware Purchase:**

Customer will purchase from Aurum, and Aurum will sell to Customer the following Hardware
Products:

<u>HP ML370 G3 Rack (5U)</u>
Base model includes the following minimum components: Single 2.8 GHz Xeon CPU, 512 MB
RAM, embedded single NC7781 PCI-X NIC, 48X IDE CD ROM.  Rack Mountable, 5U form factor
Additional components may be added separately such as additional CPU, expanded memory
(up to 12 GB), RAID support (requires slot), up to 8 Hard Drives, Redundant Power supplies and
Fans, and additional network connectivity.

<u>RAM, 1 GB (2 X 512), PC 2100</u>
1 GB (2 X 512) RAM used with select HP ML and DL series platforms.  PC 2100 DDR SDRAM.

<u>Processor Module 2.8 GHz Xeon 2P</u>
Second Processor for use with select HP ML and DL series platforms.

<u>RAM, 512 MB (2 X 256), PC 2100</u>
512 MB (2 X 256) RAM used with select HP ML and DL series platforms.  PC 2100 DDR
SDRAM.

<u>DAT Tape Drive, Internal, 20/40 GB</u>
Internal Tape Drive for use with select HP ML and DL series platforms.  20/40 GB DDS-4.

<u>RAID Controller, HP Smart Array 532</u>
Provides hardware RAID functionality for select HP ML and DL series platforms.  Requires a slot.
RAID 0 and 1 requires two matching hard drives.  RAID 5 requires 3 matching hard drives.  Hard
drives are ordered separately.

<u>Hard Disk, 36 GB, HP</u>
36 GB Ultra 320 SCSI Hard Drive for use with some HP ML and DL series platforms.  Hot
Swappable, U320, 10000 RPM.

<u>Telephony Hardware</u>
Telephony cards and cables to accept incoming phone calls.

**Pricing and Payment Terms:**

Hardware Products:          $  142,272.00

Payment Schedule          $  142,272.00    due upon execution of this agreement

**Additional Warranty:**

(v. 2003.1 SC09 10.24.03)

Aurum warrants that Customer will have good title to the Products, free and clear of all liens and encumbrances.

# EXHIBIT B

ADDENDUM NO. 2 TO
FIDELITY INFORMATION SERVICES, INC.
LICENSED TECHNOLOGY AGREEMENT

      South Carolina Federal Credit Union ("Customer") and Fidelity Information Services, Inc. ("Fidelity") enter into this Addendum as of December 2, 2004 ("Effective Date").

      Recitals. The parties entered into a Licensed Technology Agreement dated November 10, 2003 as amended (the "Agreement"), and now wish to enter into this Addendum relating to the modification of certain terms of the Agreement and its related schedules, including, without, limitation, delivery and payment terms.

      Therefore, in consideration of the recitals and the mutual promises in this Addendum, the parties agree as follows:

1.     Paragraph 2.3 of the MISER Professional Services Schedule is hereby amended by changing the MISER Scheduled Payment timing to the following: The MISER scheduled payment of $184,000 should be made on the later of either conversion to the Aurum MISER System or May 2, 2005.

2.     Paragraph 3.1.1 of the ViewPoint Branch Automation (BA) Professional Services Schedule is hereby amended by changing the MISER Scheduled Payment timing to the following: The MISER scheduled payment of $120,500 should be made on the later of either conversion to the Aurum MISER System or May 2, 2005.

3.     The Maintenance Schedule for Aurum Telephone Banking System is hereby amended by changing the MISER Scheduled Payment timing to the following: $7,500 (which has already been paid in full by Customer) for the first year beginning on the later of either conversion to the Aurum MISER System or May 2, 2005 (the "First Year") and $15,632.31 annually beginning one year following the First Year.

4.     Fidelity shall provide a Satisfactory Delivery (as defined below) to Customer of the products and services set forth in the Fidelity Project Plan attached hereto as Exhibit A and the Survivor-SCFCU Products Features Expectations Document attached hereto as Exhibit B (collectively, the "Survivor Critical Product Deliveries") no later than the dates specified in the Survivor Critical Product Deliveries. If Fidelity fails to timely deliver to Customer those Survivor Critical Product Deliveries due on or prior to November 30, 2004 (collectively, the "November Deliverables"), Customer will receive a credit based on the total amount of fees specified in the MISER Professional Services Schedule and View Point Branch Automation Software Schedules (referred to hereafter as "Specific Fees"). If the November Deliverables are late by 1-10 days, the credit will equal 10% of the Specific Fees, 11-20 days 20% of the Specific Fees and 21-30 days 33% of the Specific Fees. Fidelity will issue credits if the delays in delivery of the particular November Deliverable at issue are due solely to actions or omissions of Fidelity. If Fidelity fails to provide a Satisfactory Delivery of all of the Survivor Critical Product Deliveries by December 31, 2004, (a) Customer shall have the right to (I) immediately terminate the Agreement with no further obligation to Fidelity, (II) terminate any and all other executory contracts with Fidelity and all of Customer's obligations thereunder, including, without limitation, the Aurum Technology Inc. Information Services

CLT 814235v5

Technology Services Agreement dated July 1, 2004 (the "ATM Agreement"), and (III) notwithstanding anything to the contrary in the Agreement, receive a full refund of all fees paid to Fidelity pursuant to the Agreement; and (b) the Agreement shall be amended as set forth on the attached Exhibit C. Satisfactory Delivery shall be defined as (i) free from defects which substantially affect Customer's ability to service its members; (ii) operating without errors; (iii) operating in accordance with signed Functional Requirement Documents (FRDs); (iv) operating in accordance with Professional Quote Requirements (PQRs); and (v) meets objectives of User Acceptance Testing (UAT) as agreed upon by Customer and Fidelity, which will be confirmed with UAT sign-offs for each objective. If Customer chooses not to terminate the Agreement, Customer may, in its sole discretion, extend the delivery dates for the remaining Survivor Critical Product Deliveries (collectively, the "Extended Delivery Dates"). If Fidelity fails to timely deliver to Customer the remaining Survivor Critical Product Deliveries in accordance with the Extended Delivery Dates, (a) Customer shall have the right to (I) immediately terminate the Agreement with no further obligation to Fidelity, (II) terminate any and all other executory contracts with Fidelity and all of Customer's obligations thereunder, including, without limitation, the ATM Agreement, and (III) notwithstanding anything to the contrary in the Agreement, receive a full refund of all fees paid to Fidelity pursuant to the Agreement; and (b) the Agreement shall be amended as set forth on the attached Exhibit C.

5.    In addition to the remedies set forth in Section 4 above, Fidelity agrees that it will reimburse Customer up to $500,000 for a contract termination based on the terms of this Addendum. Such reimbursement will cover documented expenses associated with staff time during the project, as well as equipment upgrades to the Customer's existing hardware system after termination.

6.    The remedies set forth in Sections 4 and 5 above shall be Customer's sole and exclusive remedy for Fidelity's failure to deliver the Software and enhancements in accordance with the timeframes outlined herein, and Customer hereby expressly waives any and all claims, damages or causes arising out of or relating to any failure by Fidelity to deliver the Software and enhancements in accordance with the timeframes outlined herein. Provided however, nothing contained herein shall constitute a waiver of Customer's rights to bring claims against Fidelity for Fidelity's subsequent failure, delay or breach, in accordance with the terms of the Agreement or this Addendum.

7.    To the extent that there are inconsistencies between Fidelity Project Plan attached hereto as Exhibit A and the Survivor-SCFCU Products Features Expectations Document attached hereto as Exhibit B, the Survivor-SCFCU Products Features Expectations Document attached hereto as Exhibit B shall control.

8.    Except as expressly amended by this Addendum, the Agreement shall remain in full force and effect.

2

In witness whereof, the parties execute this Addendum as of the Effective Date.

South Carolina Federal Credit Union                Fidelity Information Services, Inc.

By: _Bonnie G Karst_                               By: _____
Name: _Bonnie G Karst_                             Name: _Sandy J Cannon_
Title: _Chief Information Officer_                  Title: _Vice President_
Date: _12-2-2004_                                  Date: _12-2-2004_

3

CLT 814259v5

## EXHIBIT C

### Addendum No. 3 to the Licensed Technology Agreement

Paragraph 14 is deleted and replaced in its entirety with the following:

14.     Any changes or modifications that Licensee makes to a Licensed Program voids the foregoing limited warranties. EXCEPT AS SET FORTH ABOVE, AURUM MAKES NO OTHER WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT; AND AURUM MAKES NO WARRANTIES WITH RESPECT TO ANY HARDWARE THAT AURUM MAY SUPPLY TOGETHER WITH THE LICENSED PROGRAM(S) OR FOR THEIR IMPLEMENTATION.  With respect to hardware supplied by Aurum, Aurum will, upon request, assign to Licensee any warranties that have been made by the original manufacturer of such hardware that may be so assigned.

2.     Except as provided in Addendum No. 1, Addendum No. 2 and Addendum No. 3, the Licensed Technology Agreement is hereby confirmed, as amended hereby, and shall continue in full force and effect.

CLT 814259v5